UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

TYI RAI F.,[1]

               Plaintiff,

    v.

MARTIN O'MALLEY, Commissioner of Social Security,

               Defendant.

Case No. CV 23-07594-AS

**MEMORANDUM OPINION**

For the reasons discussed below, IT IS HEREBY ORDERED that, pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

---

[1] Plaintiff's name is partly redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

**PROCEEDINGS**

On September 12, 2023, Plaintiff filed a Complaint seeking review of the Commissioner's denial of Plaintiff's application for supplemental security income under Title XVI of the Social Security Act. (Dkt. No. 1). On November 13, 2023, Defendant filed an Answer consisting of the Administrative Record ("AR"). (Dkt. No. 11). The parties subsequently filed opposing briefs setting forth their respective positions regarding Plaintiff's claims ("Pl. Brief" and "Def. Brief"), followed by a reply brief from Plaintiff ("Pl. Reply"). (Dkt Nos. 17, 20-21). The parties have consented to proceed before a United States Magistrate Judge. (Dkt. Nos. 10, 14).

The Court has taken this matter under submission without oral argument. See C.D. Cal. C. R. 7-15.

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On May 18, 2018, Plaintiff protectively filed an application for supplemental security income alleging a disability onset date of February 9, 2013. (AR 10, 240-70). Plaintiff alleged disability based on, inter alia, diabetes, neuropathy, gastroparesis, rheumatoid arthritis, irritable bowel syndrome, bipolar disorder, post traumatic stress disorder ("PTSD"), agoraphobia, attention deficit hyperactivity disorder ("ADHD"), schizoaffective disorder, cirrhosis of the liver, anxiety, and addiction. (AR 293, 303, 310, 341-52). Plaintiff had previously applied for and been denied

2

disability benefits through March 16, 2017, by Administrative Law Judge ("ALJ") Steven A. De Monbreum. See AR 72-84 (Judge De Monbreum's decision); see also AR 98, 306 (summaries of prior claims). Plaintiff subsequently amended her alleged disability onset date for her current claim to May 1, 2018. (AR 33-34).

The Administration denied Plaintiff's current claim initially on August 24, 2018, and upon reconsideration on May 2, 2019. (AR 97-140). On August 25, 2022, ALJ Laura Fernandez heard testimony from Plaintiff (who was represented by counsel) and vocational expert ("VE") Lawrence Haney. (AR 26-61). On October 11, 2022, ALJ Fernandez issued a decision denying Plaintiff's application. (AR 10-20).

The ALJ applied the requisite five-step process to evaluate Plaintiff's case. See AR 10-19 (noting that the presumption of continuing non-disability under Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1988), did not apply). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the May 8, 2018 application date. (AR 12). At step two, the ALJ found that Plaintiff has the following severe impairments: PTSD, borderline personality disorder, and amphetamine use disorder in reported remission. See AR 13 (discussing Plaintiff's obesity and diabetes and noting that the ALJ had considered all of Plaintiff's medically determinable impairments, including those that were not severe, in assessing Plaintiff's residual functional capacity). At step three, the ALJ determined that Plaintiff's impairments did not meet or equal a listing found in 20 C.F.R. Part 404, Subpart

1  P, Appendix 1 (the "Listings"). (AR 13-16 (finding Plaintiff's
2  mental impairments caused "moderate" limitation in all four
3  "Paragraph B" criteria of psychological functioning for Listings
4  12.00, 12.08, and 12.15).

6      Next the ALJ found that Plaintiff has a residual functional
7  capacity ("RFC")[2] for light work as defined in 20 C.F.R. §
8  416.967(b), limited to: (1) occasional postural activities; (2) no
9  concentrated exposure to vibrations, unprotected heights, and
10 dangerous machinery; and (3) understanding, remembering, and
11 carrying out simple instructions with no public contact. See AR
12 14-18 (finding "persuasive" and "partially persuasive" the
13 available medical opinion evidence).

15     At step four, the ALJ found that Plaintiff was unable to
16 perform her past relevant work. (AR 18). At step five, based on
17 Plaintiff's age, education, work experience, RFC, and the VE's
18 testimony, the ALJ determined that there are jobs that exist in
19 significant numbers in the national economy that Plaintiff can
20 perform, i.e., "marker," "router," and "housekeeping cleaner." (AR
21 19). The ALJ concluded that Plaintiff had not been disabled since
22 the May 8, 2018 application date.  (AR 19-20).

24     On July 5, 2023, the Appeals Council denied Plaintiff's
25 request to review the ALJ's decision. (AR 1-5). Plaintiff now seeks

27     [2]  A residual functional capacity is what a claimant can
28 still do despite existing exertional and nonexertional limitations.
   See 20 C.F.R. § 416.945(a)(1).

4

1  judicial review of the ALJ's decision, which stands as the final
2  decision of the Commissioner. See 42 U.S.C. § 405(g).

3
4                          **STANDARD OF REVIEW**
5
6       This Court reviews the Commissioner's decision to determine
7  if it is free of legal error and supported by substantial evidence.
8  See Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012).
9  "Substantial evidence" is more than a mere scintilla, but less than
10  a preponderance. Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir.
11  2014). "It means such relevant evidence as a reasonable mind might
12  accept as adequate to support a conclusion." Revels v. Berryhill,
13  874 F.3d 648, 654 (9th Cir. 2017) (citation and internal quotation
14  omitted).

15
16       To determine whether substantial evidence supports a finding,
17  "a court must consider the record as a whole, weighing both evidence
18  that supports and evidence that detracts from the [Commissioner's]
19  conclusion." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir.
20  2001) (internal quotation omitted). As a result, "[i]f the evidence
21  can support either affirming or reversing the ALJ's conclusion, [a
22  court] may not substitute [its] judgment for that of the ALJ."
23  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

24
25                           **DISCUSSION**
26
27       Plaintiff contends that the ALJ erred by: (1) providing
28  reasons for not fully crediting psychological consultative examiner

                                    5

Dr. Lindsay Hailston's opinion that are not supported by substantial evidence; (2) adopting a mental RFC that is not supported by substantial evidence; and (3) failing to properly evaluate Plaintiff's subjective complaints. See Pl. Brief at 9-22; Pl. Reply at 1-9. After consideration of the record as a whole, the Court finds that the Commissioner's findings are supported by substantial evidence and are free from material legal error.[3]

**A.   Summary of the Medical Record**

Since Plaintiff's claims primarily concern the ALJ's consideration of her mental impairments, the Court will set forth those portions of the medical record concerning her mental impairments in more detail. The medical record reflects several treatment visits for diabetes, diabetic gastroparesis with abdominal pain, obesity, hepatitis C, and joint pain from a popliteal cyst in the knee (treated with a steroid injection, home exercises, and a short course of anti-inflammatories), and some single visits for dizziness/migraines, arthritis, a skin abscess, constipation related to methamphetamine use, nonspecific chest pain and nausea, diabetic neuropathy, a broken toe, and left arm pain associated with cervical radiculopathy (which was followed up with some physical therapy). (AR 540-43, 545-73, 619-78, 679-778, 940-44, 954-69, 1142-49, 1180-95, 1196-1219, 1238-1301, 1358, 1360-74,

---

[3]   The harmless error rule applies to the review of administrative decisions regarding disability. See McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (An ALJ's decision will not be reversed for errors that are harmless).

1    1448-59, 1493-97, 1727-28, 1729-41). Despite complaints of joint

2    pain during a visit on January 17, 2018, (see AR 550), Plaintiff

3    reportedly had normal gait and range of motion at that visit and

4    subsequent visits in September, October, and November. 2018. (AR

5    550, 1181, 1183, 1198, 1275, 1303).

6

7       The medical record also reflects treatment for mental

8    impairments including PTSD, amphetamine use disorder, opioid use

9    disorder (mild), schizoaffective disorder, bipolar disorder,

10   borderline personality disorder, and major depressive disorder (AR

11   496, 615, 916, 1312, 1447), with reports that Plaintiff was and

12   had been using methamphetamine for the past 20 years. See, e.g.,

13   AR 435, 438, 448, 454, 546, 552, 566, 572, 581, 588, 594, 597, 600,

14   601, 603, 607, 796, 804).

15

16      Plaintiff was hospitalized for a psychiatric hold from June

17   12 to 28, 2017, following a suicide attempt, reporting that she

18   had last used methamphetamine on the morning of her emergency room

19   visit and had not been leaving the house except to get

20   methamphetamine. (AR 435, 438-536, 508). Plaintiff presented as

21   disheveled, angry, distressed, appeared paranoid, and stated that

22   she wanted to leave the hospital to kill herself. (AR 524-25). By

23   June 26, 2017, Plaintiff reported that she was feeling better but

24   did not know what she would do if she was out in the community

25   again. (AR 492). She had no hallucinations or delusions, was

26   sleeping and eating okay, and had no behavioral issues. Id. At the

27   time of her discharge, Plaintiff was calm, cooperative, less

28   depressed, alert and oriented, had fair insight and judgment and

7

1    was in no apparent distress. (AR 484, 486-87). Plaintiff no longer

2    posed a risk to herself or others, but substance abuse was noted

3    as a "modifiable" risk factor and she was advised not to use. (AR

4    484, 488).

5

6        Plaintiff transferred to residential psychiatric treatment

7    where she stayed until July 5, 2017, and maintained her sobriety.

8    (AR 864-902). Her mental status examination noted that she  had

9    normal appearance, behavior, speech, thought content, insight,

10    judgment, attention, concentration, memory, and cognition, made

11    good eye contact and was cooperative and pleasant. (AR 864). She

12    was encouraged not to use and to attend psychotherapy. (AR 867).

13

14        Plaintiff attended outpatient behavior health treatment from

15    July 2017 through January 2018. (AR 580-616). Plaintiff reported

16    that she was "not okay" when she is sober and admitted that she

17    was using methamphetamine daily. (AR 597, 600, 604, 607). Records

18    from this time period also reflect continued methamphetamine use.

19    In November 2017, Plaintiff reported that she had only used

20    methamphetamine five times since her visit the previous month. (AR

21    594). On November 17, 2017, her psychiatrist noted that she may

22    continue to deteriorate with daily methamphetamine use and assessed

23    "other psychotic disorder: most likely due to chronic meth use."

24    (AR 598, 603).  In December of 2017, Plaintiff reported sobriety,

25    (AR 592) but also admitted during another visit earlier that month

26    that had used methamphetamine the night before (AR 566). In January

27    2018, Plaintiff reported that she was depressed and having

28    hallucinations, and admitted to using methamphetamine daily but

not for the past two weeks. (AR 588-89; <u>but see</u> AR 572 (Plaintiff admitting at another visit on the same day that she continued to use methamphetamine but was cutting back).[4]

In April and May 2018, Plaintiff returned to residential psychiatric treatment, (AR 785-859), reporting, at the time of her admission on April 27, 2018, that she had been clean for 19 days (AR 850).[5] When she was discharged on May 9, 2018, Plaintiff was "calm and fine," cooperative, appropriate, responsive, well groomed, made eye contact, had normal speech, and had been compliant with treatment by taking medication, attending therapy, completing activities of daily living, and participating in the program. (AR 789).

In June 2018, Plaintiff started another residential drug treatment program but was discharged in August 2018 after she relapsed. (AR 908-28, 981). Plaintiff had another psychiatric hold from August 17 to 23, 2018, after another suicide attempt. (AR 981-1000, 1340-51, 1460-85). Plaintiff then transferred to residential psychiatric treatment where she stayed until at least August 25, 2018. (AR 1115-35).

---

[4]    During visits for other conditions in January and March 2018, Plaintiff denied substance abuse and reportedly had normal mood and affect. (AR 662-63, 739-40).

[5]    Earlier in April 2018, Plaintiff had been brought to the emergency room by her husband, after she reportedly overdosed on insulin at home, and she was diagnosed with amphetamine intoxication. (AR 1498-1514).

1    In September 2018, Plaintiff presented to the emergency room

2    for seizure like activity, chest pain, and altered mental status.

3    (AR 1442-47). Plaintiff admitted using methamphetamine but denied

4    feeling suicidal and wanted to be home to visit with her daughter.

5    (AR 1447).

6

7    In October 2018, Plaintiff presented to the emergency room

8    complaining of chest pain, hearing voices, hypothermia, and

9    hypoglycemia. (AR 1196-1224). She admitted using methamphetamine

10    and tested positive for such use. (AR 1197, 1203, 1210, 1217,

11    1226). When she was discharged, she was noted to be in fair/improved

12    condition and instructed to follow up with mental health. (AR

13    1199).

14

15    Plaintiff had another psychiatric hold from November 19 to

16    27, 2018, after another suspected suicide attempt. (AR 1153-79,

17    1311-39). Her toxicology screens at the time were negative for

18    amphetamines, (AR 1172), but earlier that month, Plaintiff's drug

19    screen was positive for methamphetamine. (AR 1360). On November

20    27, 2024, Plaintiff left the facility against her doctor's advice.

21    (AR 1328).

22

23    There are no mental health treatment records from December

24    2018 to June of 2022, when Plaintiff presented in Oregon for

25    outpatient counseling for PTSD, borderline personality disorder,

26

27

28

1    and stimulant dependence in remission. (AR 1754-69).[6]  Plaintiff

2    reported that she last attempted suicide the Sunday before, when

3    she tried to cut her wrist and throat. (AR 1755). She was living

4    in a shelter. (AR 1755). During subsequent visits, Plaintiff said

5    that she "accidently" learned where to purchase heroin but had so

6    far avoided that environment and was not using. (AR 1756, 1759-

7    60).

8

9        In early July 2022, Plaintiff had acquired a studio apartment

10   and it was noted that she was making progress. (AR 1761).  On July

11   7, 2022, she reported that she had attempted to overdose on insulin

12   the week before following an altercation with her ex-husband over

13   money and was trying to get home health care. (AR 1762). On July8,

14   2022, Plaintiff reported dissociative states where she "checks

15   out," and denied substance abuse, but admitted to spending time

16   with people using drugs and said it was possible that a neighbor

17   had drugged her. (AR 1763). A rapid urine methamphetamine test

18   showed a faint line. Id.

19

20       On July 21, 2022, Plaintiff reported that she had obtained

21   work from family members and was able to purchase a new computer

22   with her earnings. (AR 1766). On July 25, 2022, Plaintiff reported

23   that she was able to take a bus to her daughter's house in another

24   town, was helping her sister move after a divorce, had been asked

25

26

27       [6]   Plaintiff had moved to Oregon after filing her
     application and reportedly had been sober since May 2022. (AR 47-
28   51).

11

to provide additional office work, had "discovered cooking" for healthier living and was taking daily beach walks. (AR 1767).

On August 4, 2022, Plaintiff reported that her new computer would help her "generate better workflow," and while she was making progress and feeling value in herself, she was still having depression and dysregulated emotions. (AR 1768). At her last reported appointment, on August 11, 2022, Plaintiff said her emotional state was more "even," and she had fought off a craving to use the week before with the help of her sponsor. (AR 1769).

**The Opinion Evidence**

Consultative examining clinical psychologist, Dr. Lindsey Hailston, provided a Psychological Assessment Report dated April 19, 2019. (AR 1720-23). Dr. Hailston reviewed some medical records from 2018 for an emergency room visit and hospital stay for drug overdose suicide attempts. (AR 1720). Plaintiff complained of several conditions including PTSD, ADHD, panic disorder with agoraphobia, anxiety, addiction, and bipolar disorder. (AR 1720). Plaintiff said it was very hard for her to get out of her house because she has difficulty going out in public, her depressive episodes had gotten worse, and she currently was abusing methamphetamine. (AR 1721). Plaintiff reported a history of psychiatric hospitalizations a few times a year since 2010 for suicidal ideation, attempts, and homicidal attempts. (AR 1721). Plaintiff said therapy does not help her. (AR 1721).

On mental status examination, Plaintiff was disheveled, overweight, had cuts on her arms, was anxious and tearful with pressured speech, had difficulty with attention and concentration, was hypervigilant about being around people, and reported auditory and visual hallucinations although she was not observed to be having any hallucinations at the time. (AR 1721-22). Plaintiff admitted abusing methamphetamine for 20 years. (AR 1722). Regarding her activities of daily living, Plaintiff reported she knew how to use appliances but was unable to do so because of her functioning and lack of motivation. (AR 1722). She reported that her boyfriend helped her get dressed her because of her fear in leaving the house. (AR 1722).

Dr. Hailston noted that Plaintiff had "a lengthy history of psychiatric symptoms that include mood disorder, suicide attempts, self-harm, assaultive behavior, and methamphetamine abuse for 20 years," and indicated that it was "unclear whether her mood related symptoms [were] induced from significant methamphetamine abuse for several years." (AR 1722). Dr. Hailston diagnosed borderline personality disorder, stimulant use disorder (amphetamine-type substance, severe), and "R/O" (rule out) substance/medication-induced bipolar and related disorder. (AR 1722).

Dr. Hailston opined that Plaintiff would have: (1) no impairment in understanding, remembering, and carrying out simple instructions; (2) mild impairment with complex instructions; (3) moderate impairment in maintaining attention, concentration, pace, and persistence; and (4) severe impairment in enduring stress,

adapting to change in routine work settings (due to daily methamphetamine abuse and personality disorder), interacting with supervisors and coworkers (due to daily methamphetamine abuse), interacting with the public (due to a legal history of assault), and maintaining emotional regulations (due to daily methamphetamine abuse). (AR 1723). Dr. Hailston noted that it was possible Plaintiff's condition would improve with appropriate treatment and/or services. Id.

State agency reviewers considered the record initially in August 2018, and made the following findings: (1) Plaintiff would be capable of light work with some postural and environmental limitations mostly consistent with the physical RFC the ALJ adopted (which Plaintiff does not challenge) (AR 97-116); (2) Plaintiff would have moderate limitations in several areas of functioning (i.e., understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday or workweek without interruption from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, and setting realistic goals or making plans independently of others). (AR 111-12); and (3) Plaintiff would be "capable of sustained simple nonpublic task work activities." (AR 112). In reaching this determination, the reviewing psychologist noted that Plaintiff's symptoms were reasonably attributable to her mental medically determinable impairments, which were characterized as " depressive, bipolar and related disorders." (AR 106-07).

On reconsideration, in April 2019, state agency reviewers considered the updated record, which included Dr. Hailston's opinion, and agreed with the initial RFC determination. (AR 117-40). Plaintiff had reported that she was experiencing worsening mental health symptoms and had a recent psychiatric hold. (AR 365, 375). It was noted that Plaintiff was using methamphetamine at the time of Dr. Hailston's evaluation, and the severe limits found by Dr. Hailston were attributed to Plaintiff's daily methamphetamine abuse. (AR 129). Plaintiff's substance abuse was determined to be material to Plaintiff's claim because "it clearly exacerbates the severity of symptoms that are attributable to psych impairments" and Plaintiff's worsening condition – by the time of reconsideration – was "linked to active substance use." Id. The review concluded that a mental RFC for "SRT/NP" [simple repetitive tasks with no public contact] "while in treatment and abstaining from substance use would reasonably apply." (AR 129; compare AR 138 (general statement that there was no evidence of substance use disorder which is contrary to the detailed Findings of Fact and Analysis of Evidence).

**B.** **Plaintiff Has Not Shown Material Error in the ALJ's Mental RFC Assessment.**

Plaintiff contends that the ALJ's reasons for discounting Dr. Hailston's opinion in determining Plaintiff's mental RFC isa not supported by substantial evidence, and that Plaintiff's mental RFC is otherwise not supported by substantial evidence because it did not account for some of Plaintiff's "moderate" mental limitations.

15

1  (Pl. Brief at 9-19; Pl. Reply at 1-7). As set forth below, the ALJ

2  provided reasons, supported by substantial evidence, for finding

3  Dr. Hailston's opinion "partially persuasive," and the ALJ's mental

4  RFC determination is supported by substantial evidence.

5

6      **1.    Applicable Law**

7

8      For claims filed after March 27, 2017, such as Plaintiff's

9  claim, new regulations govern the evaluation of medical opinion

10  evidence. Under these regulations, ALJs no longer "weigh" medical

11  opinions; rather, ALJs determine which opinions are the most

12  "persuasive" by focusing on several factors: (1) supportability;

13  (2) consistency; (3) relationship with the claimant (including the

14  length of treatment, frequency of examinations, purpose of

15  treatment, extent of treatment, whether the medical source examined

16  the claimant); (4) the medical source's specialty; and (5) "other"

17  factors. See 20 C.F.R. § 416.920c(c)(1)-(5). The two most important

18  factors in determining the persuasiveness of medical opinions are

19  supportability and consistency with the evidence. See 20 C.F.R. §

20  416.920c(a). ALJs must explain how they considered the factors of

21  supportability and consistency, but need not explain how they

22  considered any other factor. See 20 C.F.R. § 416.920c(b).

23

24      Supportability means the extent to which a medical source

25      supports the medical opinion by explaining the "relevant

26      . . . objective medical evidence." Consistency means the

27      extent to which a medical opinion is "consistent. . .

28

with the evidence from other medical sources and

nonmedical sources in the claim."

_Woods v. Kijakazi_, 32 F.4th 785, 791-92 (9th Cir. 2022) (internal

citations omitted; citing 20 C.F.R. § 416.920c(c)(1), (2)).[7]

## 2.   Analysis

The ALJ followed the new regulations in making the required
findings based on the available record. The ALJ detailed Dr.
Hailston's examination and opinion that Plaintiff would have some
moderate and severe mental impairments. (AR 14-15). The ALJ found
Dr. Hailston's opinion "partially persuasive," reasoning that Dr.
Hailston's observations were "consistent with and supported by the
longitudinal evidence of record" and "provide further support" for
Plaintiff's "moderate limitation in her activities of daily living
due to her psychiatric conditions." (AR 15). The ALJ noted that
Dr. Hailston found severe limitations attributed, in part, to
Plaintiff's methamphetamine abuse. (AR 15). The ALJ found that -

---

[7]   The new regulations also eliminated the term "treating
source," as well as the rule previously known as the treating
source rule or treating physician rule, which formerly required
special deference to the opinions of treating sources. _See_ 20
C.F.R. § 416.920c; _Woods v. Kijakazi_, 32 F.4th at 792 ("The revised
social security regulations are clearly irreconcilable with our
caselaw according special deference to the opinions of treating
and examining physicians on account of their relationship with the
claimant."); _see also_ 81 Fed. Reg. 62560, at 62573-74 (Sept. 9,
2016). Even so, in evaluating medical opinion evidence "under the
new regulations, an ALJ cannot reject an examining or treating
doctor' opinion as unsupported or inconsistent without providing
an explanation supported by substantial evidence." _Woods v.
Kijakazi_, 32 F.4th at 792.

other than her methamphetamine use – there was insufficient evidence to support severe impairments based on Plaintiff's psychiatric condition because the record reflected improvement in Plaintiff's psychiatric condition and limited mental health treatment during periods of sobriety. (AR 15).

Substantial evidence supports these findings.  As detailed above, and as the ALJ summarized (see AR 14), the treatment record reflected methamphetamine use throughout, including at the time of Dr. Hailston's evaluation, with mental health treatment mostly centered around times when Plaintiff was using methamphetamine. Plaintiff's providers reported improvement in her symptoms during periods of inpatient treatment for substance abuse when Plaintiff was not using.  See, e.g., AR 484, 486-87, 492, 789, 864, 1153, 1311-13).  Plaintiff's most recent treatment records (July and August 2022) note Plaintiff's improvement with sobriety to the point where she was able to find her own housing, travel to visit her daughter, and work for a family member. (AR 1761, 1766-69).

The ALJ also found "persuasive" the opinions of the state agency reviewers, which had expressly considered Dr. Hailston's opinion on reconsideration, and found that, absent substance use, Plaintiff would be capable of simple repetitive tasks with no public contact consistent with the mental RFC adopted by the ALJ. (AR 17). The ALJ reasoned that these opinions were consistent with, and supported by, the longitudinal evidence of record which reflected that Plaintiff was medication compliant and had limited complaints or treatment for any mental conditions since 2018. (AR

17). These opinions are substantial evidence to support the ALJ's mental RFC assessment. <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001) (opinion of non-examining physician "may constitute substantial evidence when it is consistent with other independent evidence in the record"); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (where the opinions of non-examining physicians do not contradict "all other evidence in the record," such opinions may furnish substantial evidence).

Plaintiff faults the ALJ's findings as internally inconsistent because the ALJ discounted Dr. Hailston's opinion about Plaintiff's "severe" limitations after finding that the evidence was insufficient to show they were due to psychiatric conditions (as opposed to substance use), but also found "persuasive" the state agency psychological reviewers' opinions that assertedly found Plaintiff's drug use "not material" to her claim. <u>See</u> Pl. Brief at 11-14; Pl. Reply at 3 (citing AR 114, 138 (the general statements that there was no evidence of any substance abuse disorder or "DAA" (drug abuse or alcoholism) issue)). The record does not support Plaintiff's assertion. As set forth above, the state agency reviewers found, on reconsideration, that Plaintiff's substance use was material to her claim and that, absent substance use, she would have a capacity consistent with the mental RFC the ALJ adopted. (AR 129). The Court finds no internal inconsistency in the ALJ's reasoning.

Plaintiff also faults the ALJ for failing to follow the rules for considering the effect of substance use under Social Security

Ruling ("SSR") 13-2p. (Pl. Brief at 11-14; Pl. Reply at 3). Where, as here, a claimant has a substance use disorder, SSR 13-2p requires ALJs to apply the five-step sequential evaluation process twice if the record suggests disability. See SSR 13-2p, 2013 WL 621536, at *6. First, "the ALJ must conduct the five-step inquiry without separating out the impact of alcoholism or drug addiction," to determine whether a claimant is disabled. Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001). If the ALJ finds the claimant disabled, the ALJ must proceed to the second five-step consideration to determine whether alcoholism or drug addiction is "material" to the finding that a claimant is disabled (i.e., would the individual still be found disabled if he or she stopped using drugs or alcohol). See SSR 13-2p, 2013 WL 621536, at *4, 6; see also 20 C.F.R. 416.935(b). A claimant will not be found disabled where alcoholism or drug addiction is a contributing factor material to disability. See 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered disabled. . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."). An ALJ's failure to perform the foregoing analysis is harmless if the ALJ found that abstinence from drugs and/or alcohol would have cured the claimant's disability. Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007).

The Court discerns no material error. The ALJ did not expressly mention or follow the process outlined in SSR 13-2p. (AR 12-19). The ALJ found Plaintiff was not disabled considering her drug use (which the ALJ found was in remission). (Id.). The ALJ

would not have been required to factor out Plaintiff's drug addiction if the record otherwise did not establish Plaintiff was disabled. Bustamante, 262 F.3d at 955. By finding that Plaintiff's drug use was in remission, where the record suggests that Plaintiff's drug use was not in remission until, at the earliest, May 2022 (see AR 50-51), the ALJ effectively proceeded directly to the second five-step inquiry.

If the ALJ had followed the process outlined in SSR 13-2p, the ALJ ultimately would have found Plaintiff not disabled because there is substantial evidence that Plaintiff's substance use was material to her claim. See AR 129 (materiality finding). Accordingly, the Court discerns no material error from the ALJ's failure to follow the process outlined in SSR 13-2p.

Finally, Plaintiff asserts that the ALJ's mental RFC assessment does not adequately account for the "moderate" limitations the ALJ found at step three in certain areas of functioning (i.e., in interacting with others and maintaining concentration, persistence, or pace). (Pl. Brief at 14-19; Pl. Reply at 4-7). Contrary to Plaintiff's assertion, the ALJ adequately accounted for her findings by relying on the opinions of the state agency reviewers in determining Plaintiff's mental RFC. (AR 17). The state agency reviewers found "moderate" limitations in these areas of functioning (see AR 107, 130), but also found Plaintiff capable of performing simple nonpublic tasks (see AR 112, 136) consistent with the mental RFC adopted by the ALJ. The ALJ was not required to do more.

**C.    The ALJ Did Not Err in Assessing Plaintiff's Testimony and Statements**

Plaintiff contends that the ALJ's reasoning was inadequate for discounting her statements and testimony suggesting greater limitations than the ALJ found to exist. See Pl. Brief at 19-22; Pl. Reply at 7-9.

**1.    Applicable Law**

When assessing a claimant's credibility regarding subjective pain or intensity of symptoms, the ALJ must engage in a two-step analysis. Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. Garrison, 759 F.3d at 1014. "In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (emphasis in original) (citation omitted). "Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Id. (citation omitted).

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. Id. at 1014-15; see also Robbins, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on

22

affirmative evidence thereof, he or she may only find an applicant
not credible by making specific findings as to credibility and
stating clear and convincing reasons for each."). "This is not an
easy requirement to meet: The clear and convincing standard is the
most demanding required in Social Security cases." Garrison, 759
F.3d at 1015 (citation omitted). The ALJ must evaluate "the
intensity and persistence of those symptoms to determine the extent
to which the symptoms limit [the claimant's] ability to perform
work-related activities for an adult." SSR 16-3p, 2017 WL 5180304,
at *3.

While the ALJ cannot "delve into wide-ranging scrutiny of the
claimant's character and apparent truthfulness," Trevizo, 871 F.3d
at 678 n.5, the ALJ may consider "prior inconsistent statements
concerning the symptoms, and other testimony by the claimant that
appears less than candid; unexplained or inadequately explained
failure to seek treatment or to follow a prescribed course of
treatment; and the claimant's daily activities." Ghanim v. Colvin,
763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted).
Inconsistencies between a claimant's testimony and conduct, or
internal contradictions in the claimant's testimony, also may be
relevant. Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014).
In addition, the ALJ may consider the observations of treating and
examining physicians regarding, among other matters, the functional
restrictions caused by the claimant's symptoms. Smolen v. Chater,
80 F.3d 1273, 1284 (9th Cir. 1996); accord Burrell, 775 F.3d at
1137. However, it is improper for an ALJ to reject subjective
testimony based "solely on a lack of objective medical evidence to

1    fully corroborate the claimant's allegations." Bray v. Comm'r of
2    Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citation
3    omitted); see also Smartt v. Kijakazi, 53 F.4th 489, 498 (9th Cir.
4    2022) (reaffirming same but observing that inconsistency with the
5    medical evidence is a factor that can be considered; "When
6    objective medical evidence in the record is inconsistent with the
7    claimant's subjective testimony, the ALJ may indeed weigh it as
8    undercutting such testimony."); SSR 16-3p, 2017 WL 5180304, at *5
9    ("Objective medical evidence is a useful indicator to help make
10   reasonable conclusions about the intensity and persistence of
11   symptoms, including the effects those symptoms may have on the
12   ability to perform work-related activities. . .").

13

14       The ALJ must make a credibility determination with findings
15   that are "sufficiently specific to permit the court to conclude
16   that the ALJ did not arbitrarily discredit claimant's testimony."
17   Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation
18   omitted); see Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir.
19   2015) ("A finding that a claimant's testimony is not credible must
20   be sufficiently specific to allow a reviewing court to conclude
21   the adjudicator rejected the claimant's testimony on permissible
22   grounds and did not arbitrarily discredit a claimant's testimony
23   regarding pain." (citation omitted)). Although an ALJ's
24   interpretation of a claimant's testimony may not be the only
25   reasonable one, if it is supported by substantial evidence, "it is
26   not [the court's] role to second-guess it." Rollins v. Massanari,
27   261 F.3d 853, 857 (9th Cir. 2001).

28

1          **2.    Plaintiff's Statements**

2

3       Plaintiff testified that she has daily migraines and hurts

4   all the time from neuropathy and arthritis which affect her ability

5   to stand for more than five or six minutes at a time without having

6   to sit, as well as her ability to use her hands. (AR 35-41).

7   Plaintiff was walking with a walker at the time of the hearing and

8   said she used it most of the time. (AR 40; but see AR 1767 (July,

9   2022 therapy note reporting that Plaintiff was exercising by

10  walking the beach daily)).

11

12      Plaintiff testified that she has constant intrusive thoughts,

13  there are times when she feels okay and that she can do something,

14  but then she "can't." (AR 42, 44). She explained that she gets

15  depressed, and it causes her to feel like she cannot do things.

16  (AR 42). She also has PTSD which makes her terrified to sleep. (AR

17  44-45). She wakes every two hours and never wakes refreshed. (AR

18  45).  She said it is difficult for her to concentrate to complete

19  tasks, she is easily distracted, and things do not get done. (AR

20  42-44). She also has to stop "a lot" and take breaks due to pain.

21  (AR 43-44). She had "very little" contact with others – she only

22  left her place to go to doctors and to therapy. (AR 45). She usually

23  ordered food in. (AR 45-46). She did not like to go to grocery

24  stores because she felt like people are looking at her and it made

25  her nervous. (AR 46). She gets nervous around people, isolates,

26  and does not handle stress well. (AR 46, 49).

27

28

Plaintiff admitted to substance abuse and said the longest period she had been sober was for a little over a year sometime in 2009, 2010, or 2011. (AR 50). She had been clean most recently since May – for about four months – and she hoped to be clean for the next 50 years. (AR 50-51). She had moved to Oregon near her family, was living alone, and only took provided transportation to medical services and a 12-step recovery program. (AR 49, 51-52). She did not drive. (AR 51). She could walk using her walker a block and a half to a store when she needed to, but it took her quite a while to get there and she did not do it often. (AR 52). She was in the process of applying for in-home health care. (AR 53).

Plaintiff's then-fiancé provided a Function Report – Third Party form dated July 30, 2018 – when Plaintiff was in residential drug treatment (see AR 908-28) – which did not mention Plaintiff's long history of drug use. (AR 322-29).[8] He stated that if Plaintiff did not have doctor's appointments she spent her days trying not to move too much due to pain. (AR 322-29). Plaintiff needed help in and out of the shower, had trouble holding a hairbrush or razor, sometimes needed assistance to and from the toilet, had major distress from choosing an outfit to wear or what to eat, and her

---

[8] Plaintiff's fiancé provided another Function Report dated January 1, 2019, stating that Plaintiff's mental conditions interrupt every facet of her life, and limit her from contact with others causing Plaintiff to isolate in her room. (AR 377-86). When she is manic, she acts inappropriately, is rude, condescending, and combative (AR 382), she was reportedly using a wheelchair (AR 383), she relapsed with methamphetamine use even though she had remained clean for "long periods" of time and does 12 step programs, and she seemed "calmer and more focused" when she uses methamphetamine. (AR 384).

mental condition (depression) otherwise limited almost every aspect
of her being. (AR 323). She could make her own meals of cereal or
sandwiches, do laundry on her own time, but had too much pain and
mental anguish for other types of housework. (AR 324-25). She
almost never went outside due to pain and fear of people, she did
not drive, but she could shop for clothes or groceries in stores
and by computer once a week. (AR 325, 327). She spent most of her
time watching television and reading. (AR 326). He estimated that
Plaintiff could not walk more than 100 feet before needing to rest,
could pay attention "not long," and could understand and follow
directions but does not finish what she starts. (AR 327). Plaintiff
held onto walls and surfaces for balance. (AR 328).

Plaintiff also provided her own Function Report dated July
31, 2018, (AR 331-54), reporting similar limitations. She reported
that she could not concentrate, has a hard time understanding what
she reads, feels like people are looking at her, has hand cramps
that prevent her from holding a pencil or using a keyboard for
longer than five or 10 minutes, and cannot sit or stand or walk
without pain. (AR 331). She had a hard time getting along with
people. (AR 337). Plaintiff admitted that she has addiction which
impacts her ability to function until she uses again and, after
using, causes her physical and mental problems to become worse.
(AR 349-50).

3.  **Analysis**

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record." (AR 17). The ALJ based this finding on the objective medical record and Plaintiff's activities of daily living. (AR 17-18). As set forth below, the Court finds that the ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for her finding.

The ALJ found Plaintiff's asserted limitations were inconsistent with the objective medical evidence. Plaintiff testified that she is disabled due to severe pain in her body, but her medical records did not contain objective findings to support those allegations. (AR 17). Plaintiff's medical examinations did not support an inability to carry out basic work activities. (AR 18). While Plaintiff complained of mental health issues and symptoms, the record reflected that Plaintiff had significant improvement in her condition during periods of sobriety. (AR 17).

A lack of corroborating objective medical evidence is relevant to an ALJ's evaluation of a claimant's statements, so long as the ALJ does not reject statements solely on that basis. See Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (where "the claimant produces objective medical evidence of an underlying

impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain") (citing Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986)); see also Smartt v. Kijakazi, 53 F.4th at 498 (reaffirming same); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d at 1227.  Here, the ALJ's reliance on the lack of supporting medical evidence in this case was not the sole basis for rejecting Plaintiff's symptom statements and testimony. The limited record of treatment for Plaintiff's physical complaints, which did not include any significant objective findings, supports the ALJ's reasoning that the record did not support Plaintiff's claims regarding her asserted physical limitations.  The ALJ reasonably concluded that Plaintiff's alleged limitations from pain were not reflected in her treatment record.

The ALJ also found that Plaintiff's statements were inconsistent with her ability to perform activities of daily living independently. (AR 17-18). The ALJ observed that Plaintiff was able to live alone, cook, clean, and walk to a nearby store to shop for necessities. (AR 17). The ALJ also noted that since May 2022, when Plaintiff reported sobriety, she admittedly was able to work for a family member. (AR 17).

An ALJ may rely on a claimant's daily activities in discounting symptom testimony. See Orn v. Astrue, 496 F.3d 625, 639 (9th Cir. 2007) (daily activities may be used to discount subjective complaints where the daily activities "contradict [her] other testimony" or "meet the threshold for transferrable work

skills"); *see also* *Ghanim v. Coleman*, 753 F.3d at 1165 ("Engaging
in daily activities that are incompatible with the severity of
symptoms alleged can support an adverse credibility
determination."); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir.
19998) (daily activities have bearing on a claimant's credibility
where the "level of activity [is] inconsistent with the Claimant's
claimed limitations"). The ALJ observed that Plaintiff was living
on her own and was able to care for her basic needs including
cooking, cleaning, shopping for necessities, going to appointments,
and was working for her family members, and found these activities
to be "inconsistent with the activities of a person who is
completely disabled." (AR 17-18). While evidence of Plaintiff's
activities is not, by itself, compelling evidence of her ability
to engage in sustained work activity, in the context of the record
in this case which included complaints of constant pain severely
limiting Plaintiff's ability to walk, sit or stand (*see* AR 35-41,
331), the ALJ properly found that Plaintiff's ability to engage in
the daily activities she admitted suggests that she is more capable
than the severe symptoms and limitations which she claimed prevent
her from working. Accordingly, the ALJ properly discounted
Plaintiff's subjective statements and testimony based on her
admitted daily activities.

**D.    Conclusion**

        Plaintiff's claims essentially request that this Court reweigh
the evidence that was before the ALJ. "Where evidence is
susceptible to more than one rational interpretation, it is the

1  ALJ's conclusion that must be upheld." <u>Burch v. Barnhart</u>, 400 F.3d

2  676, 679 (9th Cir. 2005); <u>see also</u> <u>Brown-Hunter v. Colvin</u>, 806 F.3d

3  487, 492 (9th Cir. 2015) ("[W]e leave it to the ALJ to determine

4  credibility, resolve conflicts in the testimony, and resolve

5  ambiguities in the record.") (citation and internal quotation marks

6  omitted). The Court will uphold the ALJ's rational interpretation

7  of the evidence in this case.

8

9                                  **ORDER**

10

11      For the foregoing reasons, the decision of the Commissioner

12  is AFFIRMED.

13

14      LET JUDGMENT BE ENTERED ACCORDINGLY.

15

16  Dated: August 23, 2024

17

18                                    /s/
                        _____
19                            ALKA SAGAR
                        UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28